UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 09-10761-RGS

AMERICAN PAPER RECYCLING CORP.

v.

IHC CORPORATION, MPS/IH, LLC, and
WILMINGTON PAPER CORP.

MEMORANDUM AND ORDER ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT

April 23, 2010

STEARNS, D.J.

American Paper Recycling Corporation (APR), brought this action in Bristol Superior

Court seeking to compel performance by defendants IHC Corporation (IHC)[1] and MPS/IH,

LLC (MPS) of a waste paper sales contract.  APR also seeks to enjoin the sale of waste

paper by MPS to a competitor, Wilmington Paper Corporation (Wilmington).  Defendants

removed the case to the federal court on diversity grounds, and then moved to dismiss the

Complaint.

In the interim, APR filed an eight-count Amended Complaint alleging breach of

contract and breach of the covenant of good faith and fair dealing against IHC and MPS,

as well as tortious interference claims against MPS and Wilmington.  On August 7, 2009,

---

[1]At the April 13, 2010 motion hearing, counsel for APR made an oral request to
amend the caption of the Complaint to properly reflect IHC's new corporate name.
Counsel for defendants did not object, and the court allowed APR's request.  For purposes
of this memorandum, the court will refer to IHC when addressing matters affecting the
corporation after the date of the name change, and to Ivy Hill Corporation (Ivy) when
referring to matters arising before.

the court heard oral argument, after which it denied the motions to dismiss without

prejudice, pending limited discovery.  The court's margin Order read as follows.

> [T]he court grants the parties 120 days (until December 7, 2009) to conduct discovery limited to the nature of the acquisition of assets by MPS from Ivy Hill and the resulting corporate relationship between the two entities.  The parties will also identify all issues related to any potential liability attributable to Wilmington on the count of tortious interference.

The parties have since filed cross-motions for summary judgment.[2]  The court heard oral

argument on April 13, 2010.

## BACKGROUND

The following material facts are not in dispute or where disputed are viewed in the

light most favorable to the relevant non-moving party.  APR is an Illinois corporation

engaged in the business of purchasing waste paper and other paper products for

recycling.  APR is registered as a foreign corporation in Massachusetts and has its

principal office in Mansfield, Massachusetts.  IHC is a subsidiary of Cinram (U.S.)

Holdings, Inc. (Cinram).  Cinram is the sole shareholder of IHC.  Prior to the events giving

rise to this litigation, Ivy (now IHC) was engaged in the business of manufacturing paper

packaging for use in the media industry.  Ivy operated plants in Terre Haute, Indiana, and

Louisville, Kentucky.[3]  As a by-product of its manufacturing business, Ivy generated

---

[2]In spite of the court's limited discovery order, defendants moved for summary judgment on all counts of the Amended Complaint.  On April 8, 2010, APR filed a motion to defer the hearing on the summary judgment motions and for further discovery pursuant to Fed. R. Civ. P. 56(f).  On April 12, 2010, the court issued an order limiting the hearing to those issues for which discovery had been authorized.

[3]In addition to the Terre Haute and Louisville plants, Ivy at various times operated plants in Los Angeles and Burbank, California, and on Long Island in New York.

2

significant quantities of recyclable waste paper.  APR paid Ivy an agreed rate based on the volume and quality of the waste paper.

On November 6, 1990, Ivy and APR entered into a Waste Paper Sales Contract (Sales Contract), under which Ivy agreed to sell all of its waste paper to APR.  In return, APR provided Ivy with manufacturing equipment on generous terms.  The Sales Contract, in relevant part, provided that:

> E.    It is mutually agreed that the quantities, classification, price periods during which the Agreement shall be effective, packing, shipping and other provisions shall be as follows:
>
>> 1.    Entire accumulation of saleable waste paper stock generated at [Ivy] plants.
>
>> * * * *
>
>> 3.    This Agreement shall continue throughout December 31, 2004, and shall be automatically renewed at the same terms unless written cancellation is given by either party 90 days prior to the expiration of this contract period.

Beginning in February of 1991, Ivy and APR executed the first of ten amendments to the Sales Contract dealing with the provision by APR of additional processing equipment and financing to Ivy.  In conjunction with several of these amendments, Ivy agreed to extensions of the Sales Contract.

In November of 1993, APR undertook to "add[] baling equipment [and to build out space], for the purpose of gathering waste paper . . . at the Ivy Hill L.A. California Plant" at a cost of $386,515 to APR.  Ivy in return granted APR the right to purchase ninety percent of its waste paper product for an additional ten years to January 1, 2015.  A year

later, in November of 1994, the parties executed Amendment #4, under which APR provided additional baling equipment for Ivy's Louisville, Kentucky plant at a cost to APR of $65,545.  Ivy agreed to extend the Sales Contract for an additional year to January 1, 2016.

In March of 1996, the parties amended the Sales Contract a fifth time.  APR agreed to install and finance additional baling equipment.  In exchange, Ivy granted APR a right of first refusal for the purchase of all of the waste paper generated at the planned Burbank, California plant.  Although the pre-printed amendment form included language extending the Sales Contract for an additional year, the provision was stricken by agreement of the parties.  The Sales Contract was, however, extended for an additional year when, in July of 1996, Ivy and APR executed Amendment #6, under which APR agreed to supply Ivy with air conveyor equipment for the Los Angeles plant.

Under Amendment #7, executed on May 15, 2000, APR provided Ivy with zero-percent financing for an additional baling system for the Los Angeles plant, and  Ivy agreed to extend the Sales Contract to January 1, 2018.  When Ivy needed financing to repair two balers at its Terre Haute plant, APR again provided favorable terms.  The resulting Amendment #9 extended the Sales Contract to January 1, 2019.  The final relevant amendment to the Sales Contract occurred on May 1, 2006.  Under Amendment #10, APR agreed to finance a baler repair project at Ivy's Los Angeles plant, and Ivy agreed to a twenty-four-month extension of the Sales Contract.  The final version of the Sales Contract, as modified by the series of amendments, was to expire on December 31, 2020.

On April 9, 2009, pursuant to an Asset Purchase Agreement (APA),[4] Cinram sold substantially all of Ivy's assets to MPS in a cash-and-stock deal.[5]  Under the terms of the APA, Cinram received $23,250,000 in cash and 7,750 shares of Series C Preferred Stock in Multi Packaging Solutions, Inc., the parent company of MPS.[6]  The APA provided that:

> Buyer hereby purchases and acquires from the Company [Ivy], all of the right, title and interest in and to the Company's Assets, rights, properties and interest in properties of the Company of every kind, nature and description, whether real, personal or mixed, tangible and intangible, whether or not used in, held for usage in or otherwise relating to the Business (other than Excluded assets) . . . .

APA ¶ 1.1.

Additionally, as part of the transaction, MPS agreed to assume substantially all of Ivy's liabilities.

> Assumed Liabilities.  On the terms and subject to the conditions contained in this Agreement, simultaneously with the sale, transfer, conveyance and assignment to Buyer of Purchased Assets, Buyer hereby assumes all of the Liabilities of the Company [Ivy] relating to the Business other than the Excluded Liabilities.

APA ¶ 2.1.[7]

---

[4]The APA was impounded by a February 19, 2010 Order of the court.  Counsel have assented to the court's disclosure of relevant portions of the agreement for purposes of this opinion.

[5]Prior to its sale to MPS, Ivy had undergone two prior acquisitions.  Ivy was first purchased by Time Warner Company, which then sold Ivy to Cinram.  In both of these transactions, the Sales Contract was included among the transferred assets.  Neither acquisition impacted on APR's ability to continue to purchase Ivy's waste paper.

[6]Multi Packaging Solutions, Inc., is a Delaware corporation and the sole owner of a second Delaware corporation, John Henry Holdings, Inc., which in turns owns MPS.

[7]The excluded obligations listed at APA ¶ 2.2 are standard exclusions, including tax liabilities, employee benefit plans, environmental contamination, and liabilities covered by existing insurance contracts.

The APA then identified certain assets that would not be transferred including cash, pre-paid expenses, insurance policies, pre-paid taxes, corporate documents, bank accounts, certain employee benefit plans, and all real estate owned in fee simple. See id. In addition, Schedule 1.2(m) of the APA identified specific assets excluded from the sale, including:

> Waste Paper Sales Contract dated November 6, 1990, as amended by Amendment #1 dated February 19, 1991, Amendment #2 dated November 26, 1991, Amendment #3 dated November 9, 1993, Amendment #4 dated November 1, 1994, Amendment #5 dated March 20,1996, Amendment #6 dated July 1, 1996, Amendment #7 dated May 15, 2000, Amendment #8 dated March 29, 2001, Amendment #9 dated May 6, 2003 and Amendment #10 dated May 1, 2006, between American Paper Recycling Corporation and [Ivy].

On April 16, 2009, Ray Wheelan, a MPS Vice-President, notified Kenneth Golden, APR's President, that MPS intended to consolidate the recycling business at the newly-acquired Terre Haute and Louisville plants with MPS's existing contract with Wilmington. Wheelan told Golden that APR's recycling services at these facilities were being terminated effective May 10, 2009. On April 24, 2009, Wheelan wrote to APR warning that "[y]ou need to stop scheduling pick ups at the Terre Haute and Louisville plants effective immediately. All pick ups have been discontinued." APR then filed this lawsuit.

## DISCUSSION

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "A 'genuine' issue is one that could be resolved in favor of either party, and

a 'material fact' is one that has the potential of affecting the outcome of the case." <u>Calero-Cerezo v. U.S. Dep't of Justice</u>, 355 F.3d 6, 19 (1st Cir. 2004), citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248-250 (1986).  A party seeking summary judgment bears the initial burden of demonstrating that there is no genuine issue as to a material fact.  <u>See Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986).  To oppose the motion successfully, the non-moving party "may not rest upon the mere allegations or denials of his pleading. . . ." <u>Anderson</u>, 477 U.S. at 256.  Rather, the non-movant must submit "'sufficient evidence supporting the claimed factual dispute' to require a choice between 'the parties' differing versions of the truth at trial.'" <u>LeBlanc v. Great Am. Ins. Co.</u>, 6 F.3d 836, 841 (1st Cir. 1993), quoting <u>Hahn v. Sargent</u>, 523 F.2d 461, 464 (1st Cir.  1975).  On cross-motions for summary judgment, "the court must consider each motion separately, drawing inferences against each movant in turn."  <u>Reich v. John Alden Life Ins. Co.</u>, 126 F.3d 1, 6 (1st Cir. 1997).

### The De Facto Merger Exception

"Under generally accepted corporate law principles, the purchaser of the assets of another corporation does not assume the debts and liabilities of the transferor.  The traditional rule is subject to four generally recognized exceptions: (1) the purchasing corporation expressly or impliedly agrees to assume the selling corporation's liabilities; (2) the transaction is a merger of the two entities; (3) the purchaser is a mere continuation of the seller corporation; and (4) the transaction is a fraudulent attempt to evade the seller's liabilities." <u>Devine & Devine Food Brokers, Inc. v. Wampler Foods, Inc.</u>, 313 F.3d 616, 618 (1st Cir. 2002), citing <u>Dayton v. Peck, Stow & Wilcox Co.</u>, 739 F.2d 690, 692 (1st Cir.

1984).  See also 15 W. Fletcher, Cyclopedia of Law of Private Corporations § 7122, at

227-243 (1999).[8] Massachusetts law adheres "to traditional corporate law principles that

the liabilities of a selling predecessor corporation are not imposed on the successor

corporation which purchases its assets unless [one of these four exceptions is met]."

Cargill, Inc. v. Beaver Coal & Oil Co., 424 Mass. 356, 359 (1997), citing Guzman v.

MRM/Elgin, 409 Mass. 563, 566 (1991).  In this instance, there is no dispute that the Sales

Contract was expressly excluded from the transferred assets.  Nor is there any contention

that the transaction involved a fraudulent conveyance to MPS.  Thus, the first and fourth

exceptions do not apply.   APR relies instead on the de facto merger and "mere

continuation" exceptions.

In determining whether to characterize an asset sale as a de facto merger, courts

are to consider whether:

> (1) there is a continuation of the enterprise of the seller corporation so that
> there is continuity of management, personnel, physical location, assets, and
> general business operations; whether (2) there is a continuity of
> shareholders which results from the purchasing corporation paying for the
> acquired assets with shares of its own stock, this stock ultimately coming to
> be held by the shareholders of the seller corporation so that they become a
> constituent part of the purchasing corporation; whether (3) the seller
> corporation ceases its ordinary business operations, liquidates, and
> dissolves as soon as legally and practically possible; and whether (4) the
> purchasing corporation assumes those obligations of the seller ordinarily
> necessary for the uninterrupted continuation of normal business operations
> of the seller corporation.

Goguen v. Textron, Inc., 476 F. Supp. 2d 5, 12-13 (D. Mass. 2007), quoting Cargill, 424

Mass. at 360.  See also Guzman, 409 Mass. at 566.  Of the four factors, "no single [one]

[8]As noted in Fletcher, the absence of adequate consideration for the sale or transfer
of assets is often regarded as a fifth exception.  Adequacy of consideration is not at issue
here.

is necessary or sufficient to establish a de facto merger." <u>Goguen</u>, 476 F. Supp. 2d at 13, citing <u>Cargill</u>, 424 Mass. at 360.  "When a *de facto* merger is alleged, the court must determine 'the substance of the agreement [regardless of] the title put on it by the parties.'" <u>In re Acushnet River & New Bedford Harbor Proceedings re Alleged PCB Pollution</u> [<u>Acushnet</u>], 712 F. Supp. 1010, 1015 (D. Mass. 1989).  Here, APR argues that none of the four <u>Cargill</u> factors emblematic of a de facto merger applies.  The court will consider each factor in turn.

<u>Continuity of the Enterprise</u>

MPS absorbed the bulk of Ivy's workforce, two of its physical plants, and its core business.  However, "[i]n determining whether a de facto merger has occurred, courts pay particular attention to the continuation of management, officers, directors and shareholders." <u>Cargill</u>, 424 Mass. at 360. <u>See</u> <u>also</u> <u>Dayton</u>, 739 F.2d at 693.  MPS did not retain key members of Ivy's management team, including Ivy's Chief Operating Officer, the Vice President of Finance, the Chief Engineer, the Plant Manager, the Controller, and the IT Director.  It had none of the same officers or directors, and as noted below, the exchange involved an arms-length exchange of good and fair consideration, namely a substantial sum of cash and only a nominal interest in the shares of Multi Packaging Solutions, MPS's parent company.  MPS discontinued a number of Ivy's previous vendors, including vendors who had supplied the plants with paper, paper board, and corrugate. Finally, MPS chose to exclude the real property at the Louisville plant from the list of purchased assets, and instead chose to lease the property from Ivy-IHC.

Cargill provides an instructive contrast.  In that case, not only did the work force remain the same, the key manager stayed in place, and all of the other employees and key people (with one exception) remained the same, "maintaining their same positions and responsibilities." Cargill, 424 Mass. at 360.  The owner of the former company became a director of the new company and its largest individual shareholder. Id.  The new company "used the same telephone numbers [as the old company], the same trucks and the same equipment. [The old company's] customer lists and contracts were transferred to [the new company] all of whom were serviced just as they had been . . . ." Id. at 361.  In short, the new became the old.  Similarly, in Acushnet, the new company continued all of the old company's product lines, the president, vice-president and treasurer of the old company took the same titles and functions in the new company (as well as being made directors), the middle management remained intact, and even the banking and insurance facilities remained the same.  "For all the world could tell from outward appearance, [the new company] had simply shortened its name."  712 F. Supp. at 1016.  This factor weighs heavily against a de facto merger.

Continuity of Shareholders

The First Circuit, consistent with other courts and learned treatises, has observed that continuity of shareholders is one of the "key requirements" for application of the de facto merger doctrine. Dayton, 739 F.2d at 693.  Continuity of the shareholders "is found where the purchaser corporation exchanges its own stock as consideration for the seller corporation's assets so that the shareholders of the seller corporation become a constituent part of the purchaser corporation." Id. (citations omitted).  In this case, as

consideration for the sale, Cinram received $23,250,000 in cash and 7,750 shares of Series C Preferred Stock in Multi Packaging Solutions.  The shares, however, represent less than 3.2 percent of Multi Packaging Solutions' stock.  Moreover, as the only Series C stockholder, Cinram has no voting rights, cannot transfer its shares, and holds the shares subject to a right of unilateral redemption by Multi Packaging Solutions.  In Devine & Devine, a ten percent interest composed of voting stock did not suffice to impose successor liability under a de facto merger theory.  313 F.3d at 619.  Although in Cargill, a twelve and one-half percent voting interest was sufficient to tip the balance, this was so because the sale was between two closely-held corporations and left the owner of the predecessor entity with a seat on the successor corporation's board of directors and the largest personal holding of shares of stock.  See 424 Mass. at 361 n.9.  No members of Cinram's board of directors or any of its officers hold a similar position with MPS or were given individual shares of voting stock.  This factor weighs decidedly against a de facto merger.

Seller Corporation Ceases Its Former Business Operations

A third emblematic factor is the immediate liquidation of the predecessor entity.  The rationale underlying this exception is the protection of third parties, for example, consumers harmed by a product defect.  "[W]hatver the reach of successor liability under the law of Massachusetts, the doctrine has no applicability where . . . the original manufacturer remains in existence to respond in tort for its alleged negligence and breach of warranty."  Roy v. Bolens Corp., 629 F. Supp. 1070, 1073 (D. Mass. 1986).  Here, Ivy did not dissolve after the sale and liquidate its assets so as to put them out of the reach of

creditors, but remains in existence as IHC.  It retained ownership of the real estate where the Louisville plant is located.   It collects rents from MPS, and otherwise functions as a commercial landlord with assets, profits, and employees.  As in Roy, because Ivy "is alive and well and able to respond in damages," id., a finding of a de facto merger is virtually precluded.

### Assumption of Obligations Necessary to Continue Normal Business Operations

While MPS has continued Ivy's core business, operational changes since acquiring Ivy's manufacturing plants have replaced most of the management.  MPS has discontinued or changed vendors, and did not take ownership of Ivy's real property where the Louisville plant is situated. On balance, this factor too weighs against the argument that MPS has simply continued Ivy's business without interruption or notice.

Taking the four factors as a whole, and particularly the "key requirement" of continuity of management, officers, directors, and shareholders, it is clear that no de facto merger occurred.

### The Mere Continuation Exception

Under the mere continuation exception, "the imposition of liability on the purchaser is justified on the theory that, in substance if not in form, the purchasing corporation is the same company as the selling corporation." McCarthy v. Litton Indus., Inc., 410 Mass. 15, 22 (1991).  Accordingly, "the indices of 'continuation' are, at a minimum: continuity of directors, officers, and stockholders; and the continued existence of only one corporation after the sale of assets." Goguen, 476 F. Supp. 2d at 14-15, citing McCarthy, 410 Mass. at 23.  As the minimum threshold is not met – there is no continuity of directors, officers

12

or shareholders, or for that matter senior management – this exception has no applicability.

    <u>Tortious Interference (Wilmington)</u>

    To state a claim for intentional interference with contractual relations, a party must demonstrate that: (1) he had a contract with a third party; (2) the defendant knowingly induced the third party to break the contract; (3) the interference, in addition to being intentional, was improper in motive or means; and (4) plaintiff was harmed by the defendant's actions.  <u>G.S. Enters., Inc. v. Falmouth Marine, Inc.</u>, 410 Mass. 262, 272 (1991).  "[S]omething more than intentional interference is required" to make out the tort. <u>United Truck Leasing Corp. v. Geltman</u>, 406 Mass. 811, 815 (1990), adopting <u>Restatement (Second) of Torts</u> § 766 (1977).  <u>Cf.</u> <u>King v. Driscoll</u>, 418 Mass. 576, 587 (1994) (where a corporate official is named as a defendant, the tort requires "actual malice" or "a spiteful, malignant purpose, unrelated to the legitimate corporate interest"); <u>Blackstone v. Cashman</u>, 448 Mass. 255, 261 (2007) (freedom of action with respect to corporate interests should not be restrained by a fear of personal liability).

    The actual malice standard is a heightened burden placed on plaintiff, and not an affirmative defense to be proved by the defendant.  <u>Id</u>. at n.10.  The legitimate advancement of one's own economic interests is never "improper" for purposes of a tortious interference claim.  <u>Pembroke Country Club, Inc. v. Regency Sav. Bank</u>, 62 Mass. App. Ct. 34, 39 (2004).  As there is no plausible claim that Wilmington (which had an existing contractual relationship with MPS) acted out of any motive to gratuitously inflict harm on APR, or in accepting a corporate opportunity for the benefit of its own

13

shareholders, acted with an improper motive or improper means (such as misrepresentation or coercion). It follows that there is no viable claim of tortious interference against Wilmington.[9]

ORDER

For the foregoing reasons, MPS's motion for summary judgment is <u>ALLOWED</u> as to Counts III, IV, and VII. Wilmington's motion for summary judgment is <u>ALLOWED</u> as to Count VI. Summary judgment is <u>DENIED</u> without prejudice as to all remaining Counts. The parties are directed to file a proposed further discovery plan within twenty-one (21) days of the date of this Order with a view to ultimate resolution of the case.

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE

---

[9]Section 767 of the Restatement (Second) of Torts lists a number of non-exclusive factors to be considered in determining whether a defendant's conduct in intentionally interfering with a contract (or a prospective contractual relation) is improper: "(a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties." None of these factors weigh against Wilmington.