UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 09-10761-RGS

AMERICAN PAPER RECYCLING CORP.

v.

IHC CORPORATION, MPS/IH, LLC, and
WILMINGTON PAPER CORP.

MEMORANDUM AND ORDER ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT

April 7, 2011

STEARNS, D.J.

American Paper Recycling Corporation (APR) brought this lawsuit to compel performance by defendants IHC Corporation (IHC)[1] and MPS/IH, LLC (MPS) of a waste paper output sales contract. APR also seeks to enjoin the sale of waste paper by MPS to an APR competitor, Wilmington Paper Corporation (Wilmington). All parties have moved for summary judgment.

PROCEDURAL BACKGROUND

Defendants removed this case (filed originally in Bristol Superior Court) to the

---

[1] On March 18, 2010, in denying APR's motion to file a second amended complaint, the court permitted the instant Complaint to be restyled to reflect Ivy Hill Corporation's rechristening as IHC Corporation. The court will refer to Ivy as the corporate entity in any pre-March 2010 references to the company, and to IHC thereafter.

federal district court on diversity grounds. After defendants moved to dismiss the removed Complaint, APR filed an Amended Complaint alleging breach of contract and breach of the covenant of good faith and fair dealing against IHC and MPS, and tortious interference with contractual relations against MPS and Wilmington. On August 7, 2009, the court heard oral argument and denied the motions to dismiss without prejudice. The court also granted APR 120 days of discovery limited to an exploration of the corporate relationship between MPS and Ivy.

Following the preliminary discovery period, the parties filed cross-motions for summary judgment. After an April 13, 2010 hearing, the court rejected APR's contention of a de facto merger between Ivy and MPS and, as a result, dismisssed Count III of the Amended Complaint (breach of contract against MPS), Count IV (breach of the covenant of good faith and fair dealing against MPS), and Count VII (specific performance against MPS). The court also entered summary judgment for Wilmington on APR's claim of tortious interference with contractual relations (Count VI), finding no plausible basis to believe that Wilmington "acted out of any motive to gratuitously inflict harm on APR, or in accepting a corporate opportunity for the benefit of its own shareholders, acted with improper motive or improper means." *See* April 23, 2010 Order at 13-14.

After completion of all discovery, the parties renewed their cross-motions as to

the remaining counts of the Amended Complaint.[2] IHC moves for summary judgment against APR as to Count I (breach of contract); Count II (breach of the covenant of good faith and fair dealing); Count VII (specific performance); and Count VIII (violation of Mass. Gen. Laws ch. 93A). APR cross-moves for judgment on the same counts contending that "sufficient undisputed facts have been submitted to . . . enter Judgment against the Defendant [IHC], as a matter of law." MPS moves for judgment on the remaining claims against it: Count V (tortious interference); and Count VIII (violation of Mass. Gen. Laws ch. 93A). Wilmington also moves for judgment on APR's Chapter 93A claim against it.

## BACKGROUND

APR is an Illinois corporation with a principal office in Mansfield, Massachusetts. IHC and MPS have corporate headquarters in New York. Wilmington's corporate offices are in New Jersey.

APR is engaged in the business of purchasing waste paper and other paper products for recycling. Prior to the events giving rise to this litigation, Ivy was engaged in the business of manufacturing paper packaging for CD-ROM manufacturers. As a

---

[2] Specifically, the motions are as follows: Motion for Summary Judgment by MPS and Wilmington (Dkt. #72); Motion for Summary Judgment by IHC (Dkt. #75); Motion for Summary Judgment as to Ivy by APR (Dkt. #79); and Motion for Summary Judgment as to MPS and Wilmington by APR (Dkt. #82).

3

by-product of its business, Ivy generated significant quantities of recyclable waste paper. APR paid Ivy an agreed rate based on the volume and quality of the waste paper that it received. Ivy operated plants in, among other locations, Terre Haute, Indiana, and Louisville, Kentucky.

On November 6, 1990, Ivy and APR entered into a Waste Paper Sales Contract (Sales Contract) drafted by APR under which Ivy agreed to sell all of its waste paper to APR. The Sales Contract, in relevant part, provided that:

> E. It is mutually agreed that the quantities, classification, price periods during which the Agreement shall be effective, packing, shipping and other provisions shall be as follows:
>
> 1. Entire accumulation of saleable waste paper stock generated at [Ivy] plants.
>
> 2. Price per ton for each grade shall be adjusted monthly to confirm [sic] to Mill Purchase Order prices less $10.00 per ton.
>
> 3. This Agreement shall continue throughout December 31, 2004, and shall be automatically renewed at the same terms unless written cancellation is given by either party 90 days prior to the expiration of this contract period.

\* \* \* \*

Beginning in February of 1991, Ivy and APR executed the first of ten amendments to the Sales Contract under which APR provided Ivy with financing to

4

modernize and automate its facilities and Ivy agreed to extensions of the Sales Contract.

In November of 1993, APR undertook to "add[] baling equipment [and to build out space], for the purpose of gathering waste paper . . . at the Ivy Hill L.A. California Plant" at a cost of $386,515 to APR. Ivy granted APR the right to purchase ninety percent of its waste paper product for another ten years (to January 1, 2015). One year later, in November of 1994, the parties executed Amendment #4. APR agreed to provide additional baling equipment for Ivy's Louisville, Kentucky plant at a cost to APR of $65,545. Ivy agreed to extend the Sales Contract for an additional year to January 1, 2016.

In March of 1996, the parties amended the Sales Contract a fifth time. APR agreed to finance and install additional baling equipment at Ivy's existing plants. Ivy granted APR a right of first refusal for the purchase of the waste paper to be generated at its new Burbank, California plant. Although the pre-printed amendment form included language extending the Sales Contract for an additional year, the provision was stricken by agreement of the parties. The Sales Contract was, however, extended for an additional year when, in July of 1996, Ivy and APR executed Amendment #6 on APR's agreement to supply Ivy with air conveyor equipment for its Los Angeles plant.

Under Amendment #7, executed on May 15, 2000, APR provided Ivy with 0%

financing for an additional baling system for the Los Angeles plant. Ivy agreed to extend the Sales Contract to January 1, 2018. When Ivy sought financing to repair two balers at its Terre Haute plant, APR again provided generous terms. The resulting Amendment #9 extended the Sales Contract to January 1, 2019. A final Amendment #10 was negotiated on May 1, 2006. APR agreed to finance (at 0% interest) a $26,280.98 baler repair at Ivy's Los Angeles plant, and Ivy agreed to a twenty-four-month extension of the Sales Contract. The parties included language in Amendments #3 through #10, stipulating that "[s]hould monthly waste paper sales be insufficient to cover the above payment [for financing for purchase or repair of systems], Ivy Hill shall pay the difference to APR for any such month(s) upon receipt of [an] invoice from APR." The final version of the Sales Contract, as amended, was to expire on December 31, 2020.

On April 9, 2009, pursuant to an Asset Purchase Agreement (APA), Cinram (U.S.) Holdings, Inc. (Cinram) sold substantially all of Ivy's assets to MPS in a cash-and-stock deal ($23,250,000 in cash and 7,750 shares of C Preferred Stock in MPS).[3] MPS agreed to assume most, but not all, of Ivy's liabilities. Ivy notified APR

---

[3] Prior to its sale to MPS, Ivy had undergone two prior acquisitions. Ivy was first purchased by Time Warner Company sometime prior to 1990. In 2003, Time Warner Company sold all of its stock in Ivy to Cinram, making Cinram the sole shareholder in Ivy, now renamed IHC. In both of these transactions, the Sales Contract was included among the transferred assets, and APR continued to receive Ivy's output of waste

of the proposed APA approximately three months before it was signed. Ivy retained thirty-two contracts and assets (identified on Schedule 1.2(m) of the APA). Among the assets that remained with Ivy was the

> Waste Paper Sales Contract dated November 6, 1990, as amended by Amendment #1 dated February 19, 1991, Amendment #2 dated November 26, 1991, Amendment #3 dated November 9, 1993, Amendment #4 dated November 1, 1994, Amendment #5 dated March 20,1996, Amendment #6 dated July 1, 1996, Amendment #7 dated May 15, 2000, Amendment #8 dated March 29, 2001, Amendment #9 dated May 6, 2003 and Amendment #10 dated May 1, 2006, between American Paper Recycling Corporation and [Ivy].

MPS and Wilmington have been doing business together since at least October of 2006. Prior to MPS's purchase of Ivy's assets, Wilmington provided waste paper recycling services for nine facilities owned by subsidiaries of MPS's parent company, including plants close to Ivy's Louisville, Kentucky, and Terre Haute, Indiana facilities.

On April 16, 2009, Ray Wheelan, a Vice-President of MPS, notified Kenneth Golden, APR's President, that MPS intended to consolidate the recycling business at the newly-acquired Terre Haute and Louisville plants with MPS's existing contract with Wilmington. Wheelan told Golden that APR's recycling service at these facilities was being terminated effective May 10, 2009. APR then warned Wilmington that it

---

paper.

had an "exclusive contract with Ivy Hill." On April 24, 2009, Wheelan wrote to APR cautioning that "[y]ou need to stop scheduling pick ups at the Terre Haute and Louisville plants effective immediately. All pick ups have been discontinued." APR responded with this lawsuit.

DISCUSSION

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case." *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-250 (1986). A party seeking summary judgment bears the initial burden of demonstrating that there is no genuine issue as to a material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). To oppose the motion successfully, the non-moving party "may not rest upon the mere allegations or denials of his pleading . . . ." *Anderson*, 477 U.S. at 256. Rather, the non-movant must submit "'sufficient evidence supporting the claimed factual dispute' to require a choice between 'the parties' differing versions of the truth at trial.'" *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 841 (1st Cir. 1993), quoting *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir. 1975). On cross-motions for summary

8

judgment, "the court must consider each motion separately, drawing inferences against each movant in turn." *Reich v. John Alden Life Ins. Co.*, 126 F.3d 1, 6 (1st Cir. 1997).

*APR v. IHC*

**Count I - Breach of contract**

"Construing the language of a[ ] contract is a question of law for the reviewing court." *Affiliated FM Ins. Co. v. Constr. Reins. Corp.*, 416 Mass. 839, 842 (1994). A contract is to "be construed to give it effect as a rational business instrument and in a manner which will carry out the intent of the parties." *Starr v. Fordham*, 420 Mass. 178, 190 (1995), quoting *Shane v. Winter Hill Fed. Sav. & Loan Ass'n*, 397 Mass. 479, 483 (1986). No part of the contract is to be ignored; words are to be interpreted in the context in which they are used, measured against the background of other indicia of the parties' intent. *Starr*, 420 Mass. at 190 & n.11. "[C]ontracts rest on objectively expressed manifestations of intent" and not subjective and unexpressed expectations. *Beatty v. NP Corp.*, 31 Mass. App. Ct. 606, 612-613 (1991). As a rule, the meaning of a written document, if doubt is cast, is construed against the party that authored it. *Merrimack Valley Nat'l Bank v. Baird*, 372 Mass. 721, 724 (1977).

APR and IHC agree that the contract at issue is an "output" contract that confers on APR the right to purchase all of the waste paper generated by Ivy/IHC's business operations. Of particular significance, however, is the fact that neither the Sales

Contract nor any of its subsequent Amendments obligated Ivy to produce or sell a given quantity of waste paper to APR, nor did they contain any estimate of the amount of Ivy's expected production of "saleable waste paper stock." The First Circuit has explained that an output contract

> allocates to the buyer the risk of a change in the seller's business that makes continuation costly, while the seller assumes the risk of a less urgent change in circumstances. Indeed, pre-Code Massachusetts courts held that output contracts necessarily contemplated that the level of production would be governed by business judgment. *See Neofotistos v. Harvard Brewing Co.,* 341 Mass. 684 (1961); *see also* John C. Weistart, [*Requirements and Output Contracts: Quantity Variations under the UCC*, 1973 Duke L.J. 599,] 639 n.96. We see no reason for a change in that rationale.

*Atl. Track & Turnout Co. v. Perini Corp.* 989 F.2d 541, 545 (1st Cir. 1993).

Despite the absence of any required output provision, APR contends that Ivy's decision to sell its business without requiring the buyer to continue its waste paper business is a breach of the Sales Contract. APR reasons that its repeated provision of financing towards the purchase and repair of Ivy's waste paper equipment was a *"quid pro quo . . .* to Ivy Hill provid[ing] waste paper to APR through January 1, 2020."[4]

---

[4] APR cites *E. Massachusetts St. Ry. Co. v. Union St. Ry. Co.*, 269 Mass. 329 (1929), a pre-*Neofotistos* case, as support for its breach of contract claim. However, the underlying facts in *E. Massachusetts St. Ry.* bear little resemblance to this case. In *E. Massachusetts St. Ry.*, two railway freight companies agreed to make joint use of defendant's terminals and tracks for a five-year period. Each party had the right to terminate the contract on six-months' notice. Plaintiff gave the required notice, but then voluntarily ceased doing all business nine days later. The abrupt cessation

APR Opp'n Mem. at 11.[5] However, each time APR extended financing to Ivy, the Sales Contract was amended to make clear that Ivy was required to repay the loan in monthly installments regardless of whether Ivy's monthly waste paper production was sufficient to cover the payments.[6] It is undisputed that Ivy has fully repaid all of the financing advanced by APR over the years. It is telling that APR insisted on guarantees that its loans would be repayed if wastepaper sales fell short, but never asked for a

---

severely disrupted defendant's business. The Court held that under the circumstances the "continuation of [plaintiff's] business was essential to the carrying out of the terms of the contract." *Id*. at 332. Here, the ability of APR to operate its business did not directly depend on the Ivy contract. Nor do the terms of the contract necessarily imply an affirmative commitment by Ivy to remain in the waste paper business as was the case in *E. Massachusetts St. Ry*.

[5] Following oral argument, APR supplemented its brief with a case from the Eastern District of New York, *Canusa Corp. v. A & R Lobosco, Inc*., 986 F. Supp. 723 (E.D.N.Y. 1997) (interpreting New York law). However, the *Canusa* decision, citing *Atl. Track,* simply states that good faith provides an appropriate standard by which to judge an alleged breach of an output contract subject to *Atl. Track's* warning: "So too, in an output contract, the buyer takes the risk that the seller may reduce its production to zero. Applying good faith rather than an estimate does not give the seller an un-bargained for advantage; rather, it merely preserves the essential character of contracts that lack a fixed term, albeit through the somewhat elusive concept of good faith." *Id*. at 730 (internal quotations omitted). On the instant facts, the holding in *Canusa Corp.* is fully supportive of IHC's position.

[6] APR cites the testimony of Stephen Shapoff, Ivy's chief executive officer, that he understood that Ivy agreed to the extensions of the term of the Sales Contract in order to "recapture its investment." If the court needed to look beyond the four corners of the Sales Contract in construing the parties intent (which it does not), the statement is consistent with Ivy's position that it agreed to the extensions to have additional time to repay the loans from APR.

minimum production requirement or a guarantee from Ivy that it would remain in business. *See Neofotistos,* 341 Mass. at 689 ("Since there was no express obligation for the defendant to produce, there was no implied obligation to continue production. The only implied promise that the plaintiff could reasonably assume from the contract was that the defendant would carry out its agreement in good faith and do nothing to interfere with normal production.").[7] The decision of Ivy to cease doing business simply does not support a viable claim for breach of contract.

**Count II - Breach of the covenant of good faith and fair dealing**

"Every contract implies good faith and fair dealing between the parties to it."

---

[7] IHC persuasively cites *Neofotistos* as dispositive of APR's claims. In *Neofotistos*, a farmer sued a brewing company to recover damages for an alleged breach of a written contract under which the plaintiff agreed to purchase and the brewery agreed to sell "all of the spent or waste grain resulting from the operation of the company's brewery . . . for a period of five years commencing May 1, 1955." The defendant voluntarily ceased its operations on November 1, 1956. The plaintiff claimed that the defendant had breached the contract by ceasing to operate. Reversing the trial court's directed verdict in favor of the plaintiff, the Supreme Judicial Court held that the defendant did not commit any breach.

> [T]here was no agreement by the defendant to use its brewery for the production of any specific volume of malt beverages or indeed for any production. It was necessarily contemplated by the parties that, whatever the production, it would be governed by business conditions. The plaintiff would have no redress if in the light of those conditions the volume of malt beverages was reduced to a point where the incidental production of grain was much less than he could reasonably have anticipated."

*Id*. at 688-689.

*Warner Ins. Co. v. Comm'r of Ins.*, 406 Mass. 354, 362 n.9 (1990), quoting *Kerrigan v. Boston*, 361 Mass. 24, 33 (1972). There is no exception for sophisticated businesses. *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 473 (1991). However, not every breach of contract is a breach of the covenant. *Nagel v. Provident Mut. Life Ins. Co.*, 51 Mass. App. Ct. 763, 768 (2001).

"The duty of good faith and fair dealing concerns the manner of performance." *Uno Rests., Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004). The covenant implies "that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Anthony's Pier Four*, 411 Mass. at 471 (internal quotations omitted). "The covenant may not, however, be invoked to create rights and duties not otherwise provided for in the existing contractual relationship, as the purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance." *Uno Rests.*, 441 Mass. at 385.

"[A] party who ceases performance under an output contract for independent business reasons acts in good faith." *Atl. Track*, 989 F.2d at 545, citing *Neofotistos*, 341 Mass. at 689.[8] Ivy clearly stated its reasons for selling its assets and ceasing to do

---

[8] Want of good faith "carries an implication of a dishonest purpose, conscious doing of wrong, or breach of a duty through motive of self-interest or ill will." *Hartford Accident & Indem. Co. v. Millis Roofing & Sheet Metal, Inc.*, 11 Mass. App.

13

business. As Ivy explains: By April of 2009, when the sale to MPS took place, the music/CD packaging industry was shrinking and the financial and strategic business interests of Ivy's sole shareholder (Cinram) motivated its decision to liquidate Ivy's business. APR has presented no evidence impugning the explanation or suggesting that Cinram's real reason for negotiating the APA was to avoid Ivy's future obligations under the Sales Contract.

### Count VII - Specific performance

Specific performance is awarded only where there is a breach of a contract to sell goods of a unique character that cannot be replaced in the open market. *See, e.g., i.Lan Sys., Inc. v. Netscout Serv. Level Corp.*, 183 F. Supp. 2d 328, 332-334 (D. Mass. 2002) (denying specific performance of a contract to sell tangible software products). Waste paper is not a unique product. Moreover, because there was no breach of the Sales Contract, there is no right to specific performance.

### *APR v. MPS*

### Count V - Tortious interference

To establish tortious interference with a contractual relationship, APR must show that "(1) [it] had a contract with a third party [Ivy]; (2) [MPS] knowingly induced the third party to break that contract; (3) [MPS's] interference, in addition to being

---

Ct. 998, 999-1000 (1981).

intentional, was improper in motive or means; and (4) [APR] was harmed by the defendant's actions." *See G.S. Enter., Inc. v. Falmouth Marine, Inc.*, 410 Mass. 262, 272 (1991). APR alleges that "MPS knew that APR had a long term, exclusive and direct contractual relationship with Ivy Hill for the Louisville and Terre Haute waste paper. Notwithstanding the Ivy Hill contract, MPS prohibited APR from purchasing and/or otherwise picking up the Louisville and Terre Haute plant waste paper after May 10, 2009." APR Mem. at 8. APR contends that the conduct of MPS in this case is "strikingly similar to the conduct of the owner in *Melo-Tone*." APR Mem. at 8. The facts do not support APR's contention. In *Melo-Tone Vending, Inc. v. Sherry, Inc.,* 39 Mass. App. Ct. 315, 318 (1995), Melo-Tone had an eight-year exclusive contract with Sherry to furnish vending machines for Sherry's restaurants. Three years into the contract, Sherry was approached by a Melo-Tone competitor, Park Square Vending, which offered to convert one of Sherry's restaurants into a sports bar if Sherry would agree to replace Melo-Tone vending machines with those of Park Square. Melo-Tone filed suit alleging intentional interference with its contract with Sherry. The Appeals Court agreed with the jury's finding that Park Square had "induced Sherry to get vending machines from [it] and to push Melo-Tone's out the door." *Id*. at 318.

This, however, did not end the inquiry. The "crux of the matter," as the Appeals

Court noted, was whether Park Square had acted with improper motive. *Id.* at 319.[9] The conclusive evidence of improper motive cited by the Appeals Court was Park Square's resort to illegal means to induce Sherry to breach the Melo-Tone contract, including paying for the unlawful removal of Melo-Tone's vending machines from Sherry's premises. *Id.* at 320.

Here, by contrast, there is no evidence to support the claim that MPS interfered with APR's contract with Ivy for "any 'spiteful, malignant purpose, unrelated to [its] legitimate corporate interest,'" or that it resorted (as in *Melo-Tone*) to unlawful means. *See Shea v. Emmanuel Coll.*, 425 Mass. 761, 764 (1997). *See also Harrison v. NetCentric Corp.*, 433 Mass. 465, 479 n.16 (2001). It is undisputed that in negotiating the APA, MPS declined to assume the Sales Contract with APR because it had a

---

[9] In assessing whether Park Square's motive was improper, the Appeals Court looked to

> "the nature of the actor's conduct," Restatement (Second) of Torts § 767(a); "the interests of the other with which the actor's conduct interferes," *id.* § 76(c); and "the social interests in protecting the freedom of action of the actor and the contractual interests of the other." *Id.* § 767(e). For competition and for the rough and tumble of the world of commerce, there is tolerance, *see W. Oliver Tripp Co. v. Am. Hoechst Corp.*, 34 Mass. App. Ct. at 753, even though the fallout of that rough and tumble is damage to one of the competitors. *See Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 307 (Utah 1982).

*Id.*

16

pre-existing and wholly satisfactory business relationship with Wilmington. *See Pembroke Country Club v. Regency Sav. Bank, F.S.B.*, 62 Mass. App. Ct. 34, 39 (2004) (the legitimate advancement of one's own economic interests is not an improper motive for purposes of a tortious interference claim).

*APR v. All Defendants*

**Count VIII - Mass. Gen. Laws ch. 93A**

In its Chapter 93A claim, APR asserts that

> each of the defendants, individually and in conspiracy with each other, have taken bad faith action to destroy APR's rights under the contract. This bad faith, willful, and malicious conduct, taken in disregard of the written notices that the defendants have received from APR regarding its contract rights, violates the covenant of good faith and fair dealing that is implied in the contract at issue, constitutes tortious behavior, and shows a course of dealing that is unfair or deceptive in violation of Chapter 93A.

Am. Compl. ¶ 32. To establish a claim under Chapter 93A, APR must demonstrate an unfair or deceptive practice that falls "'within at least the penumbra of some common-law, statutory, or other established concept of unfairness.'" *Lambert v. Fleet Nat'l Bank*, 449 Mass. 119, 127 (2007), quoting *Wasserman v. Agnastopoulos*, 22 Mass. App. Ct. 672, 679 (1986). "'[B]usinesses seeking relief under Section 11 are held to a stricter standard than consumers in terms of what constitutes unfair or deceptive conduct.'" *Giuffrida v. High Country Investor, Inc.*, 73 Mass. App. Ct. 225,

238 (2008) (citation omitted).

It is true, as APR argues, that a breach of the covenant of good faith and fair dealing may (but does not ineluctably) lead to a violation of Chapter 93A. *See Massachusetts Emp'rs Ins. Exch. v. Propac-Mass, Inc.*, 420 Mass. 39, 43 (1995). *Cf. Frostar Corp. v. Malloy*, 63 Mass. App. Ct. 96, 109 n.26 (2005) ("As the defendants correctly observe, *Anthony's Pier Four* . . . does not support the plaintiffs' assertion that the finding of a breach of the covenant of good faith and fair dealing compels a finding of a violation of G.L. c. 93A."). Because there is no evidence that Ivy breached the covenant of good faith and fair dealing, no Chapter 93A violation can be based on that ground.[10]

Chapter 93A further states that

> [n]o action shall be brought or maintained under this section unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth.

Mass. Gen. Laws ch. 93A, § 11. Courts apply this standard by considering the facts

---

[10] "Although whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact . . . the boundaries of what may qualify for consideration as a G.L. c. 93A violation is a question of law." *R. W. Granger & Sons v. J & S Insulation, Inc.*, 435 Mass. 66, 73 (2001), quoting *Schwanbeck* 31 Mass. App. Ct. at 414. "A ruling that conduct violations G. L. ch.93A is a legal, not a factual, determination." *R. W. Granger*, 435 Mass. at 73. *See also Diamond Crystal Brands, Inc. v. Backleaf, LLC*, 60 Mass. App. Ct. 502, 507 (2004).

"in the context of the entire § 11 claim," and then determining "whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth." *Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*, 438 Mass. 459, 472-473 (2003) (expressing reservations about the utility of any "one size fits all" functional test and suggesting "a center of gravity" test instead). *See also Kenda Corp. v. Pot O'Gold Money Leagues, Inc.*, 329 F.3d 216, 234-235 (1st Cir. 2003).

All of the acts to which APR objects took place outside of Massachusetts. The Ivy/IHC and MPS corporate offices are located in New York. Wilmington's corporate offices are in New Jersey. The plants serviced under the MPS-Wilmington contract are located in Terre Haute, Indiana, and Louisville, Kentucky. Ivy's other plants were located in Los Angles and Burbank, California, and on Long Island in New York. APR offers no evidence that any harm it incurred originated from or was felt in Massachusetts. *See Bushkin Assoc., Inc. v. Raytheon Co.*, 393 Mass. 622, 638 (1985) (alleged deceptive phone calls made from Massachusetts that were received and acted upon in New York lay outside the realm of ch. 93A). For lack of gravity, APR's Chapter 93A claims fail in their entirety.[11]

---

[11] Moreover, it is undisputed that MPS and Wilmington have had a business relationship dating from 2006, and that it was MPS that solicited Wilmington to provide waste paper recycling services for the newly-acquired Louisville, Kentucky and Terre

19

ORDER

For the foregoing reasons, APR's motion for summary judgment is <u>DENIED</u>. The motions for summary judgment brought by IHC, Wilmington and MPS are <u>ALLOWED</u>. The Clerk will enter judgment for defendants and close the case.

SO ORDERED.

/s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE

---

Haute, Indiana plants. Under the circumstances, there is no basis on which Wilmington could be found to have acted deceptively or unfairly with regards to APR.